# REPORTS

OF

## CASES ARGUED AND DETERMINED,

### JUNE TERM, 1841.

BATES & HINES v. THE BANK OF THE STATE OF ALABAMA.

1. A plea recited certain rules and regulations of the State Bank, proposing to make advances on cotton, on certain terms and conditions, particularly set forth in the rules and regulations—that pursuant thereto, one Major Cook, pretending to act as agent of the Bank, advanced to the defendant Bates, seventy-nine thousand six hundred and thirty-two dollars, and received from him one thousand and twenty-two bales of cotton; that thereupon, the said Cook executed a receipt, or statement setting forth the receipt, of the cotton, and advance of the money aforesaid, under the rules and regulations aforesaid; whereupon, the defendants executed the Bill of Exchange sued on, and fifteen others, amounting in all to the sum of money advanced, which were delivered to the said Cook; then follows an averment, that the said sum of money was received for, and on account of, the cotton so delivered, and not for, or on account of, the said Bills of Exchange but that the Bills of Exchange were to be held by the Bank, for the purpose of securing to it the payment of such sums as the nett proceeds of the cotton, when sold, might be less than the sum of money advanced upon it: Held

First—That this last avernment of the plea was not the averment of an independent fact unconnected with the rest of the plea; but was a conclusion of the pleader from the facts previously averred.

Second—That, if it was considered as a separate averment, unconnected with the preceding averments, then the plea would be bad, as it would offer two distinct issues of fact; one upon a contract made pursuant to, and by authority derived from, the "rules and regulations of the Bank;" and another on a contract made without reference to these rules and regulations.

Bates & Hines v. The Bank of the State of Alabama.

Third—That the plea did not question the regularity of the appointment of Cook, but impliedly affirmed it.

Fourth—The contract described in the plea, is not a dealing in " goods, wares and merchandise" within the meaning of the prohibition, contained in the 20th section of the charter of the Bank.

2. A Bank may appoint an agent to transact any business which it may lawfully do; and such appointment may be made by a mere corporate vote.

3. An artificial person is bound by the same implications and inferences, which bind a natural person.

4. The 40th section of the act of incorporation of the State Bank, is directory merely; and therefore, if a bill is purchased or discounted by the Bank, for a larger sum than five thousand dollars, the contract is not therefore void.

5. A large loan made to one individual, and separate Bills of Exchange, for five thousand dollars each, taken as security, is within the spirit, if not within the letter of the prohibition of the 40th section of the charter.

6. The meaning of the prohibition contained in the 20th section of the charter is, that the Bank shall not buy and sell goods, wares, or merchandise, for the purpose of gain ; or do the ordinary business of a merchant, or trader ; or engage in the business of a broker, or commission merchant.

7. A contract by which a Bank lent a large sum of money, taking Bills of Exchange at nine months for the payment thereof, and received at the time, and as one of the conditions of the loan, a quantity of cotton, with authority to ship it to a foreign port, and sell it for the account, and at the risk and expense of the owner, and to credit his bill with the amount of the nett proceeds, adding the difference of exchange between this State and the place where the cotton was sold, is not a dealing in " goods, wares, or merchandise" within the prohibition of the 20th section of the charter of the Bank.

8. A stipulation in the contract, that the Bank shall be allowed to retain one per cent. will not render the contract void; it being evident from the entire contract, that the object of the Bank was, not to obtain the cotton to sell on commission, but that the contract gave the Bank a mere authority to sell, for the purpose of paying the debt, The stipulation therefore cannot be enforced. PER OR-MOND, J.

9. The plea is demurrable, because if issue were taken on it, it would admit the introduction of parol testimony, to contradict the legal effect of the contract.

10. The act of 23d December, 1837, to limit the accommodations of the Presidents and Directors of the Bank of the State of Alabama and its several branches, is, in effect, an expression of opinion by the Legislature, that the proviso to the 40th section of the charter of the State Bank, is directory merely.

11. When words used in a contract, are susceptible of two meanings ; one agreeable to, and another against law, the former sense shall be adopted.

12. The subject matter of the contract, and the inducements which led to it, must be looked to, to ascertain the meaning of obscure or contradictory parts of it.

13. The different clauses of a written instrument, must be construed together, whether they precede or follow ; and the Court must not allow to a particular expression a controlling force; but the intention must be gathered from the whole instrument, unless it is obvious, the parties intended otherwise.

Bates & Hines v. The Bank of the State of Alabama.

14. The legal effect of the transaction recited in the plea is, that the bills were purchased by the bank, and the cotton received as security only, for the re-payment of the money advanced on the bills.

15. If the construction of the contract set out in the plea, is, that the money was advanced upon the cotton; it was also advanced upon the bills; and the bills and the cotton are primary and concurrent securities; and, in that event, a recovery may be had upon the bills, though the transaction, so far as it relates to the cotton, was invalid..

16. The 2nd section of the act of December, 1837, to limit the accommodation of the Presidents and Directors of the Bank of the State of Alabama and its branches, impliedly recognizes the right of the Bank to purchase from any one bills drawn on cotton. PER COLLIER, C· J.

THIS was an action, commenced by motion, by the defendants in error, against the plaintiffs in error, as drawer and endorser of a bill of exchange for four thousand six hundred and thirty-two dollars and seventy-five cents. The defendants appeared, and pleaded—first, Non-assumpsit. Second, That the plaintiff was indebted to him in the sum of seventy-nine thousand six hundred and thirty-two dollars and seventy-five cents —a part of which they offered to set off against the plaintiff's demand. And, third, A special plea, as follows:

And, for further plea in this behalf, said defendants say *actio non*, &c.; because they say, that heretofore, on the 29th day of August, 1838, at the Bank of the State of Alabama at Tuscaloosa, in the county aforesaid, the said plaintiffs adopted certain rules and regulations, in substance as follows, that is to say: "Bank of the State of Alabama, Tuscaloosa, 29th August, 1838. The Board of Directors, being desirous of placing the Bank in a situation to resume specie payments as early as possible; and to maintain the character and value of its paper; and, in order to accomplish these two important and desirable objects, she must be provided with a suitable proportion of specie and exchange funds—will make advances on cotton, under the following rules and regulations:

1. The receipt of the warehouse keeper, or the receipt of the agent of this Bank, at Mobile, or other satisfactory voucher, shall be submitted to the committee, hereafter appointed, under the provisions of the 8th section.

2. The cotton shall be shipped only to the agents for the Bank at Liverpool, New York, New Orleans or Mobile.

3. All cotton advanced on, will be shipped by the Bank, for account and risk of the party to whom the advance is made; and the Bank will, in no case, be accountable for losses, &c., except arising from neglect or mismanagement of its own agents.

4. All expenses of freight, commission, insurance, &c., shall be paid by the party for whose account and risk the cotton is shipped. The shipper may limit or fix the price, and the time at which he desires the cotton to be sold; but that limit as to price and time, must terminate at the expiration of four months from the time of its arrival in a foreign port; at which period the sales must be closed.

5. From the time the proceeds of any cotton comes to the hands of the agent of the Bank, or is deposited to its credit in any corresponding Bank, the amount of nett proceeds, with interest at the rate of six per cent. per annum, shall be allowed to the credit of the note, or bill, which have been given for the amount of said cotton.

6. Any person obtaining an advance on cotton, as above, shall give his bill at not exceeding nine months for amount advanced; secured by two good and sufficient endorsers.

7. In the event the nett proceeds of the cotton be more than the amount advanced, the Bank shall refund; if less, the party so indebted to the Bank, may settle the deficiency by a good bill, not having longer to run than the 15th February thereafter; provided the same be offered twenty days before the maturity of the bill given for the amount advanced; and no advance shall exceed twenty-five per cent. above the actual value of the cotton at the time it is received by the Bank.

8. A committee of five, the President or Cashier being one, shall be appointed; which committee shall have power to pass on any paper offered under this arrangement.

9. The Bank shall, for the mutual safety of itself and the party for whose account and risk it ships, have the right of insuring all cotton it may ship; and, in the event of loss, the insurance money shall be placed to the credit of the bill given for the advance on any cotton thus lost.

10. All the exchange, existing at the time the cotton is sold, between the United States and Liverpool for cotton sold there,

if any, shall enure to the account of the shipper, the Bank retaining one and a half per cent. for the transaction.

11. The Bank will appoint one agent here for the purpose of receiving, sampling, marking and shipping cotton to the agent at Mobile; and shall be allowed twelve and a half cents per bale for such service.

12. The adoption of the above regulations, will not be so considered as to forbid advances from being made before the delivery of the cotton; but in cases where the citizen is in danger of having his property sacrificed, on his giving satisfactory paper and evidence of his solvency, the Bank will, under the foregoing regulations, purchase bills of exchange on New York, having not longer than the first day of February to run; provided the drawer will execute his written pledge to deliver a warehouse receipt, or the receipt of its agent in Mobile, by the tenth day of February next for a sufficient quantity of cotton to cover said bill, to be shipped to our agent in Liverpool, New York or New Orleans. The drawer of the bill shall have the privilege, after delivering the cotton to our agent, of taking up the bill payable in New York with one payable in Mobile, at nine months from that time; and in case the cotton is not delivered agreeably to contract, the bill shall be forwarded to New York and protested, and the parties immediately sued.

13. That Pitcher & Ball, our agents in Mobile for receiving and shipping cotton, be furnished with a copy of the foregoing regulations; and that they be authorized, until otherwise instructed, to receive cotton on account of this Bank, for shipment to Liverpool; and that they transmit the number of bales, marks, weights, classification and valuation of such lots or parcels of cotton; and on such report and receipt, the shipper will receive his advance here, according to the foregoing regulations.

14. That Messrs. Fontaine & Prince are appointed the agents of this Bank at Liverpool; Messrs. William & Robert Kelly, at New York; Messrs. Pitcher & Ball, at Mobile; and Messrs. Marr, Brown & Co., at New Orleans;—John Marrast, Joel White, Robert Jemison and James Hogan, committee.

Whereas, different opinions are entertained, as to the inten-

tion of this Bank in the tenth section of the cotton regulations.

Be it therefore resolved, in all cases of shipment, whether to New York, New Orleans, or Liverpool, or elsewhere, beyond the limits of this State, that the difference of exchange shall enure to the planters, except the per cent. retained by the Bank for the transaction, and that the same be reduced, so as in no case, to exceed one per cent.

And the said defendants further say, that, afterwards, on the 5th day of May, 1839, the said defendant, Bates was lawfully possessed, as of his own property, of one thousand and twenty-two bales of cotton, then being in the City of Mobile, in this State, of great value, to wit: of the value of eighty thousand dollars; and the said defendants further say, that, on the said fifth day of May, in the year aforesaid, at the City of Mobile aforesaid, and not at the Bank of the State of Alabama, in the County aforesaid, one Major Cook, pretending to act as the agent of the plaintiffs, under the rules and regulations aforesaid, advanced to the said defendant, the said Bates, on said one thousand and twenty-two bales of cotton, seventy nine thousand six hundred and thirty-two dollars seventy-five cents; and therefore, the said defendant, the said Bates, then and there delivered the said cotton to Messrs. Pitcher & Ball, the agents of the said plaintiffs, in the City of Mobile, appointed by the 14th section of said rules and regulations, so adopted by said plaintiffs, as aforesaid; and the said Major Cook, so pretending to act as agent, &c., as aforesaid, then and there made and delivered to the said defendant, Bates, a certain paper writing, in the word and figures following, that is to say, " Bank of the State of Alabama, Tuscaloosa, May 1st, 1839. The President and Directors of the Bank of the State of Alabama, have advanced John M. Bates, of Greene County, seventy-nine thousand six hundred and thirty-two dollars seventy-five cents, on one thousand and twenty-two bales of cotton, agreeable to the regulations adopted at a meeting of the board of Directors, on the 29th August, 1838; which is to be shipped to Messrs. Fontaine & Prince, of Liverpool, who are the agents of this Bank; said cotton is to be sold for the benefit of

said John M. Bates, and the proceeds are to be placed to the credit of this Bank, in Liverpool, England.

MAJOR COOK, Agent."

And the said defendant, the said John M. Bates, thereupon then and there made the said bill of exchange, in the plaintiff's notice described; and also, fifteen other bills of exchange, each for the sum of five thousand dollars; all of said bills of exchange, bearing date and becoming due, and payable at the same time, with the said bill in the said notice described; all of which, said bills were then and there endorsed by Frederick C. Ellis, now deceased, and the defendant, Hines did, then and there deliver the said bills of exchange, so made and endorsed as aforasaid, to the said Major Cook, pretending to act as agent, as aforesaid.    And the said defendants further say, that the said seventy-nine thousand six hundred and thirty-two dollars seventy-five cents, was advanced to and received by the said defendant, Bates, on the said first day of May, eighteen hundred and thirty-nine, in the City of Mobile, and not at the Bank of the State of Alabama, in the County aforesaid, for and on account of said one thousand and twenty-two bales of cotton, so delivered to Messrs. Pitcher & Ball, as aforesaid, and not for, or on account of said bills of exchange, or any, or either of them; and that the said bills of exchange were made, endorsed and delivered, as aforesaid, to the said Major Cook, pretending to act as agent, as aforesaid.    On the said first day of May, in the year 1839, in the City of Mobile, to be thereafter, delivered to the said plaintiffs, and to be held by them, for the purpose of securing to the said plaintiff, the payment of such sum, as the nett proceeds of said one thousand and twenty-two bales of cotton, might be less than the said sum of seventy-nine thousand six hundred and thirty-two dollars seventy-five cents, so advanced to and received by the said defendant, Bates, and for and upon no other consideration, or purpose whatever.    And the said defendants further say, that afterwards, to wit: on the        day of            , in the year aforesaid, the said bills of exchange were delivered to and received by the said plaintiff, for the purpose aforesaid, and this said defendants are ready to verify, wherefore, &c.

34

The plaintiff took issue to the country, on the first and second pleas, and demurred to the third plea, which demurrer was sustained by the Court; whereupon, the defendants withdrew their first and second pleas, and declining to plead over to the third plea, judgment was rendered for the plaintiffs; from which the defendants prosecute this writ of error, and assign for error, the judgment of the Court below, on the demurrer to the third plea.

PECK, for the plaintiff in error, in argument, insisted that the Bank, although, the property of the State, was a mere corporation and as such possesses those powers only, which are conferred by the charter, or necessary to its existence. [3 McCord's Rep. 377; 2 Peters' 323; 4 Whea. 136 ; 16 Johns. Rep. 358 ; 2 Cow. 678; 13 Peters 587; 5 Porter 309; 1 Stew. 307; 12 Whea. 68 ; 2 Cranch 166.]

If the charter prescribes a mode of contracting, and that mode is not observed, or if a contract be made, which the charter does not authorise, in either case, the contract will be void, and no action can be maintained on such contract. [7 Wend. 482; 5 Conn. 500 ; 13 Peters 487; 2 ibid. 527.]

Denies that the transaction described in the plea, was legal, because there was no express authority in the charter, authorising it; nor was it necessary to enable the Bank to exercise any of the powers expressly granted. [4 Peters' Rep. 169; 3 Wend. 485.

Insists, that it was a dealing in goods, wares, and merchandise, and within the meaning of the prohibition contained in the twentieth section of the charter. [Aik. Dig. 62; 1 Ala. Rep. N. S. 161; 8 Gill & Johns. 272, 319.]

ELLIS & THORNTON, contra. Insisted that the Bank had power to create an agent. (13 Peters 587 ; 21 Wendell 296; 3 Cow. 684; 12 Wheat. 70.)

That the substance of the contract recited in the plea was, that the money was lent on the bills; and that the cotton was taken as collateral security ; that it was in the nature of a pledge. But if, within the prohibition of the charter, though it might authorise a forfeiture of the charter, it could not be taken advantage of, by the defendants.

Bates & Hines v, The Bank of the State of Alabama.

They also insisted, that the prohibition, not to purchhse a bill of exchange, for more than five thousand dollars, was directory merely.    In support of these propositions, they cited Story on Bailment 315; 15 Wendell 218; 11 Pickering 482; 15 Johns. 390; 2 Cowan 310; 8 Wheaton 349; 12 Sergeant & Rawle 264; 7 Cranch 299; 19 Johns. 60; 21 Wendell 186; 1 Randolph 78; 12 Wheaton 81; 3 Rand. 141; 9 Mass. 423; 5 Littell 46; 2 ibid. 301; Breese Rep. 203; 16 Mass. 102; 2 Kent's Com. 291.

ORMOND, J.—The first question presented is upon the plea: Whatare its allegations ? and what did the parties intend to putin issue?    The plea which is elaborately drawn, consists of several distinct facts, all however connected together and evidently supposed by the pleader to tend to the result which is relied on as a bar to the action, that the transaction was a "*dealing in goods, wares and merchandise*" and therefore prohibited by the charter of the Bank.

It commences with setting forth certain rules and regulations adopted by the Bank, for its government in the projected design of advancing or leading money on the security of cotton, placed under its control, and proceeds to allege that the defendant, Bates, being possessed of one thousand and twenty-two bales of cotton in Mobile, one Major Cook, pretending to act as the agent of the Bank, *under the rules and regulations aforesaid,* advanced to the defendant on the cotton, seventy-nine thousand, six hundred and thirty-two dollars, seventy-five cents.— That thereupon the cotton was delivered to Pitcher & Ball, the agents of the Bank, appointed to receive it by the 14th article of the rules and regulations of the Bank set out in the plea; that thereupon Cook executed a receipt or statement, setting forth the receipt of the cotton and advance of the money, under the rules and regulations entered into by the Bank; that thereupon the bill of Exchange here sued on and fifteen others, amounting in all, to the sum of seventy-nine thousand six hundred and thirty-two dollars, seventy-five cents, were executed and delivered to Cook.

It is then avered in the plea, that the said sum of money was received for and on account of the cotton so delivered, and not for or on uccount of the said bills of Exchange, but that the bills of Exchange were to be held by the Bank for the purpose of securing to it the payments of such sums as the nett proceeds of the cotton when sold, might be less than the sum of money advanced upon it.

On the part of the plaintiff in error, it was insisted that the last averment in the plea, was the statement of a substantive fact, showing the intention of the parties to the contract and admitted by the demurrer to be true; whilst the defendant in error by its counsel, insisted that this statement in the plea was merely a conclusion from the facts previously stated, and could not be considered as the averment of a distinct and independent fact.

There is no rule of pleading better established than that a plea should present a single ground of defence, though it may consist of many facts so connected together as to present a single point. Thus in this case, the regulations of the Bank, and the acts of the parties in Mobile, the delivering of the cotton, the receipt by Bates of the money, and the execution and delivery of the bills of Exchange, though entirely distinct in their nature, may all be embraced in one plea if they all tend to produce a certain result and were well pleaded, if the design of the pleader was to state the facts necessary to enable him to raise the question whether the transaction thus set forth was authorised by the charter of the Bank, or, whether as affirmed by him, it was a "*dealing in goods, wares and merchandise,*" and therefore unauthorised and void. If as he now contends, the last averment in the plea was of a fact shewing the intention of the parties unconnected with the previous allegations of the plea ; why were the previous allegations introduced? Are the averments that the rules and regulations recited in the plea were made by the Bank; that pursuunt thereto. and by authority derived therefrom, Bates received the money specified in the plea, delivivered his cotton, and executed and delivered the bills of Exchange to the agents of the Bank, mere surplussage? or were these averments not intended rather, to present to the court all the

facts of the transaction that the law arising thereon might be determined. It seems to us that no other conclusion can be attained, and that the statement which it is contended now, is the averment of a separate and independent fact, is merely the conclusion of the pleader from the facts previously alleged. If the plea be not so considered, it would then present two distinct issues of fact; one upon a contract made under the "rules and regulations" of the Bank, as recited in the plea; and another upon a contract by which the money was advanced on cotton without reference to those "rules and regulations." This could not be supported if such was the design of the pleader: but we are very clear that such is not the meaning of the plea, but that the last averment, is to be taken in connexion with, and as subordinate to, the previous averments in the plea, which indeed would be without meaning unless so interpreted.

The pleader in describing the acts of Cook, the agent of the Bank at Mobile, speaks of him as "the pretended agent of the Bank:" but we do not understand that it was thereby intended to put the fact of his agency in issue, if such had been the intention, it should have been distinctly averred, that he had no authority to act as agent of the Bank. But such could not have been the design of the pleader, because it is admitted in the plea, that the defendant dealt with him as the agent of the Bank, received from him the money which was advanced, and took from him a receipt or statement setting forth the whole transaction; it is also averred that the Bank received both the cotton and the bills of Exchange, which is in effect an admission by the Bank of the agency of Cook.

It was however insisted in argument, that the Bank had no power to create an agent for the purpose of carrying into effect the contract described in this plea. If the contract is not in itself illegal, it will not become so by being made on the part of the Bank, through the medium of an agent.

Whatever may be the rule as to corporations existing only by the common law, it is now well settled both in England and the United States, that whatsoever a corporation, created by statute, may lawfully do, it may transact by its agent.—

That such agent may be appointed by a corporate vote, and that such appointment will be inferred in the case of an artificial as of a natural person, by such acts as create a presumption of agency.—4 *Bar. & Cress.* 575—13 *Peters'* 519—12 *Whea.* 64—12 *Serg. & Rawle*, 264—21 *Wendell*, 296—8 *Wheaton*, 338. (See also, *Angel & Ames on Corporations*, 122, and the authorities cited in support of the text.)

The questions of law arising out of the plea, which go to the merits of the case, are—

1st. The effect of the prohibition in the 40th section of the act of incorporation, against the purchase of any draft or bill of exchange for a larger amount than five thousand dollars.

2d. Is the contract described in the plea, within the meaning of the 20th section of the charter, which forbids the Bank to "deal in goods, wares, or merchandize."

1. The bill of exchange sued on, in this case, is for less than five thousand dollars, but it is averred in the plea, that upon the delivery of the cotton to the agent of the Bank, and the receipt of the money advanced upon it, that this bill and fifteen others, for five thousand dollars each, all drawn and endorsed by the same persons, bearing date and payable at the same time, were executed and delivered to the agent of the Bank.

The language of the 40th section of the charter of the Bank is, "It shall not be lawful for the President and Directors of said Bank to purchase or discount any draft or bill of exchange for a larger sum than five thousand dollars, and on every draft or bill of exchange purchased or discounted by the said Bank, there shall be at least two responsible endorsers, each of which shall be considered good for the amount of such draft or bill. Provided," &c.

It is very clear that the directions contained in this section cannot he evaded by the Directors of the Bank by splitting up a large loan of money into fragments, and taking several bills from the same parties for the whole amount. Considering this transaction, for the present, as a loan of money, secured by bills of exchange, we are very clear, that if it is not within the letter, it is at least within the spirit of the prohibition. It cannot be

disguised, that the loan of money, though apparently divided into small sums, is a single transaction, and is, in effect, a loan to the same individuals, of the enormous sum of near eighty thousand dollars; thus producing the very result which it was the design of this clause to guard against. This being the cha-racter of the transaction, what are the legal consequences attending it?

The counsel for the plaintiff in error maintains, that the con-tract is void, in consequence of this violation of the charter, and that no recovery can be had on either of the bills of exchange.

The general principle, that a corporation can make no con-tract which it is not either expressly authorized to make by its charter, or which is not necessary to enable it either directly or indirectly to fulfil the purposes of its creation, is clearly shewn by the authorities cited. Some diversity, however, appears to exist upon the question whether the particular form prescribed in the act of incorporation must be observed to make the con-tract obligatory. It is not, however, necessary from the view we take of this case, to enter on that inquiry. But be the rule of construction in this class of cases ever so strict, it must be admitted that in most, if not every act of incorporation, while certain rules are prescribed which cannot be transcended, and the observance of which are essential to the validity of its con-tracts, there are others which are merely *directory* to the offi-cers of the corporation, and their observance not necessary to the validity of contracts made in reference to them. The ca-ses of *The Commissioners, &c.* vs. *Leckie,* 6 *Serg. & Rawle,* 166—*The Bank of the Northern Liberties* vs. *Cresson,* 12 *ib.* 306—*The Bank of the United States* vs. *Dandridge,* 12 *Wheaton,* 64—and *Bulkley and others* vs. *The Derby Fish-ing Co.* 2 *Conn. Rep.* 252, conclusively establish this proposi-tion.

The rule is thus concisely stated by Mr. Justice Story, in the case cited from 12 Wheaton: " That some of the provisions of the charter and by-laws, may well be deemed directory to the officers, and not conditions, without which their acts would be utterly void, will scarcely be disputed. What are to be deemed such provisions must depend on the sound construction of the

nature and object of each regulation, and of public convenience and apparent legislative intention." If the clause of the charter we are considering is brought to this test, its true character cannot be misunderstood. The management of a private stock Bank might be safely left to the jealous scrutiny of the stock-holders, but an institution like ours, in which the Directors had no private interest, required to be guarded and secured by checks on the conduct of the agents of the public, to whom the management of the Bank might be intrusted. Accordingly we find, among other restraints, that the Directors were ordered not to lend on note more than two thousand dollars to one individual, or to advance more than five thousand dollars in the purchase of a bill of exchange. The reason of this restraint is most apparent—its intention cannot be misunderstood—it was to secure the Bank against loss by the loan of large sums to one person. To accomplish this object, not only the amount is limited, but the Directors are required to take at least two responsible endorsers, either of whom shall be considered good for the whole amount. We presume no one would say the latter part of the clause was not directory, and yet it stands precisely on the same footing with the previous part.

It was doubtless expected by the Legislature, that its commands would be obeyed by its agents, but it is impossible to suppose that it was contemplated as the result of a regulation intended to protect the public against loss, that if by collusion with the Directors, or as was doubtless the fact in this case, by an honest mistake on the part of the Directors, an individual could succeed in getting, on a bill of exchange, a larger sum than the charter allowed, that the same regulation would protect him against paying it. Whatever may be the liability of the Directors in such a case, nothing can be clearer to our minds than that the borrower must refund the money. Any other construction would place the entire capital of the Bank at the mercy of a venal directory and profligate borrowers.

We might advert to other portions of the charter, which are also directory to the officers of the Bank, and having the same object in view, the protection of the capital of the Bank; but

among them all, none is more clearly directory than this, or more unequivocal in its character.

The Court is therefore unanimous in the opinion, that this clause of the charter is *directory merely ;* and that if it be disregarded, no one, a party to its violation, can take advantage of it.

2. The principal question in the cause, depends on the construction to be put on the 20th fundamental law of the Bank, considered in connection with the contract set out in the plea.

The language of this rule is, " The said Bank shall not deal in articles of goods, wares or merchandize, in any manner whatever, unless it be to secure a debt due the said Bank, incurred by the regular transactions of the same, as is provided for in this act."

What is meant by the term *deal* in goods, wares or merchandize ?    The counsel for the defendant in error, maintained that it should receive such a construction as would embrace any meaning which could be attached to the phrase : Thus, he insisted, that " to have to do with," was one of its meanings, and having been once applied by this Court to the same term, as employed in another Bank charter, in the case of *the Branch Bank at Montgomery* vs. *Knox & Co.*—(1 *Ala. Rep. N. S.* 148,) should be considered the proper construction of the phrase in this clause.    One of the safest modes of interpretation of the meaning of words in a statute, is, to presume that language, not technical, is used in its natural and popular sense, unless the context requires a different interpretation to carry out the intention of the Legislature.    This mode of expounding a statute, will, in the great majority of instances, lead to a correct result ; whilst on the other hand, where there is no ambiguity or doubt as to the meaning of a term, to reject its plain and popular sense, and which so considered, harmonizes with the object the Legislature must have had in view, and to resort to lexicographers to ascertain some remote and recondite sense, in which it may be employed or understood, would be to defeat the intention of the enactment,

The design of the Legislature, in the prohibition we are considering, was possibly, to protect the State against improvi-

dent contracts, by dealing in merchandize, for which such an institution would not be well qualified, when brought in contact with the shrewdness and sagacity which characterize individual enterprize. But the main and evident design was, to protect the citizen against the overwhelming influence of such a large capital coming into competition with the citizen, in the ordinary pursuits of trade and commerce, and to prevent the fluctuations and convulsions to which trade and commerce would be subjected, by the employment of such a large capital in any of the usual pursuits of our enterprising population.

This being the design, the phrase to " *deal in*," evidently means to *buy and sell for the purpose of gain* ; or it might, without any strained construction, be construed to mean, the taking or receiving of goods, wares or merchandize, to be sold for the owner for a profit, or commission. The interdict of the clause would therefore embrace not only the mercantile pursuit, of buying and selling goods, wares and merchandize, for gain, but would also include the sale of merchandize for and on account of the owner—or what is commonly called a brokerage or commission business. There can be no doubt that cotton is merchandize, within the meaning of the prohibition, and that all chattels which may be the subjects of commerce, are also included.

In the case of the *Bank* vs. *Knox*, cited from 1 *Ala. Rep.* 118, this Court was called on to construe the language in the charter, " to deal in bills of exchange," and we then held, that to carry out the obvious intention of the Legislature, the term to deal, must receive a liberal construction, and that it would authorize the taking of a bill of exchange, payable elsewhere, for collection merely. This conclusion was attained, by considering the language employed, in reference to the subject on which it was to act, the powers, duties, purposes, and object of the creation of the Bank. The Court hold this language :—
" This power necessarily extends to all transactions with bills of exchange, which are in themselves lawful, and considered by the Bank as expedient, to enable it to increase its business or extend its profits. It might, and frequently would, be very

important for a Bank to collect the same bills which it would be hazardous to purchase, either from the risks attending the course of trade, or because the solvency of the parties might be questionable. To receive them thus, would be important, whenever it became necessary to import specie, or provide a fund at a distant place. These illustrations, we consider sufficient, to show, that the *dealing* in bills, is not necessarily, a *purchase*, but it also includes the taking of them for collection."

It is important to consider, that in the case just cited, a power was conferred on the Bank, and in ascertaining its extent, the Court, according to well established principles, held the power to be co-extensive with the objects intended to be accomplished. It may also be remarked, that the Court held, that the Bank had the power to receive the bill for collection, by virtue of its duty to receive money on deposit, without invoking the aid of the clause to *deal* in bills of exchange.

In this case, the exercise of a power is *forbidden* to the Bank, and the same rule of construction which obtained in the case cited, would be obviously improper in this. The consequence to which it would lead, would be, that the Bank could not purchase such articles as would be necessary to enable it to perform its functions. The prohibition was doubtless inserted out of abundant caution; for if it were not in the charter, the Bank would be confined in its contracts, to those subjects upon which it was contemplated it should act, by its nature—the capacities conferred on it by the charter, and the object of its creation.

In the case of *Fleckner against the Bank of the United States*, (*8th Wheaton*, 338) the Court was called on to construe the words of a prohibition in the charter of that Bank, which were, " deal or trade in goods, merchandize, or commodities, whatsoever." The Court held, " that the true interpretation of the rule was, not that it prohibited purchases generally, but that it prohibits buying and selling for the purposes of gain. It aims to interdict the Bank from doing the ordinary business of a trader or merchant, in buying and selling goods for profit, and uses the words " deal" and " trade," in contradistinction to purchases made for the accommodation or use of the Bank, or resulting from its ordinary banking operations."

The language of the prohibition in this case, is more extend-ed than that of the one at bar; but we are unable to perceive any substantial difference between them. For it will be observed, the language is to " deal or trade," by which was certainly meant by the Legislature, (as the Court say,) that the words were of equivalent import; superadding the word " trade," therefore, could not, and did not affect the question. After a most anxious examination of the question, such an one as its great importance and the responsibility of the decision are well calculated to command, we have not a doubt as to the proper construction of the prohibition we have been considering.

It remains now to inquire, what is the nature of the transaction recited in the plea. Is it a purchase of cotton, for the purpose of sale ? or was it a receipt of cotton, by the bank, to sell on commission for, and on account of the owner ? or was it a loan or advance of money, for which the borrower was undoubtedly responsible, with an authority to sell the cotton for the payment of the debt ?

These inquiries are to be answered by an examination of the " Rules and Regulations of the Bank," recited in the plea.— These constitute, in fact, the contract between the parties. They are propositions made by the Bank, and promulgated of the terms on which it was willing to lend its money, which when acceded to, and executed by a compliance with its terms, became obligatory on both parties.

To a full understanding of this matter, it is necessary to look at the history of the country at the time this proposition was made by the Bank, in August, 1838.

In the early part of the year 1837, owing to the convulsions in commerce, and other causes, there was a general suspension of specie payments by the Banks of the different States—and by the sudden withdrawal of the accustomed supply, commerce languished, and great distress pervaded the entire community. As a necessary consequence of this state of things, confidence was lost, and the bank, though willing to pursue its accustomed course, could not do so without the risk of increasing the a-

mount of indebtedness to the Bank, which was already too great. In addition, by the act of the called session of 1837, the Banks of the State were required to replenish their vaults with specie. During the existence of this state of things, the bank adopted and promulgated the "rules and regulations" now under consideration. The preamble states, "That the board of directors being desirous of placing the Bank in a situation to resume specie payments as early as possible, and to maintain the character and value of its paper, and to accomplish those important and desirable objects, must be provided with a suitable proportion of specie and exchange funds, will make *advances on cotton* under the following rules and regulations."

Here the object and purpose is distinctly stated, but however laudable the end might be, it will not justify the use of unlawful means. It is stated that the Bank would "make advances on cotton," and this expression was laid hold of as showing the character of the transaction; but it is obvious that the Bank could not by affixing a particular name to it, alter its character. This instrument like all others, must be considered altogether to arrive at its meaning—and it is expressly stated in the preamble, that the "advance" will be made under the following rules and regulations; to them therefore we must look to ascertain its true intent and meaning.

The sum of these "articles" is, that any person having cotton in possession, might have it valued, and upon its delivery to the agent of the Bank, receive an advance thereon, not to exceed twenty-five per cent. above the actual value; and should thereupon give his bill for the amount received, payable in nine months, with two good endorsers. The cotton so received by the Bank, was to be shipped by it, at the risk and expense of the owner, who had the right to limit the price and time for, and at which the cotton should be sold; but this power ceased at the expiration of four months from the time of the arrival of the cotton in a foreign port. Upon its sale, the nett proceeds were to be placed to the credit of the bill, with interest at six per cent. per annum; the excess, if any, to be paid by the Bank to the shipper, who was also to be entitled to the benefit of all

difference of exchange, when the cotton was sold in a foreign port, except one per cent. which the bank was allowed to retain. The Bank to be accountable for no losses but those arising from the misconduct or mismanagement of their agents. In the event the proceeds of the cotton did not pay the bill, the bank agreed to take for the deficiency a good bill on New-York, not having longer to run than the 15th February thereafter, if offered twenty days before the first bill fell due.

The 12th article of the rules was designed to provide for those cases where a citizen was greatly pressed for money, but had not his cotton ready to deliver; in such cases the bank agreed to purchase bills of exchange on New-York, having not longer to run than the 1st February, provided the borrower would execute a written pledge to deliver in Mobile, to the agent of the Bank, a sufficiency of cotton to pay the bill; and in that event, was to be permitted to take up the bill on New-York, by one payable in Mobile at nine months.

It would be idle to consider the proposition of the Bank an offer to purchase cotton ; nor was that contended for by counsel. What then was its character? In our opinion, it is a loan of money for the repayment of which, the borrower permits the Bank to have the control and sale of cotton delivered at the time of the receipt of the money. The transaction, it is true, was not an ordinary one, but the times were extraordinary. The ordinary mode of transacting this business would have been for Bates to have shipped this cotton himself, to some foreign port, to have drawn a bill against it, and sold the bill to the Bank. Had he done so, the amount in the hands of his agent to pay the bill, would have been the sum the cotton produced after paying all expenses. So in this case, the nett proceeds of the cotton, with in addition, the difference of exchange between this country and that in which the cotton was sold, goes to pay his debts here. Or suppose him to have shipped his cotton and had the funds transmitted to him in gold and silver, this he could by sale at the advance between the price of specie and the depreciated paper of the Bank, have converted into the paper of the Bank, and discharged his bills. Or further, sup-

pose that he had sold his sterling bills for the currency of the Bank, and paid the debt—in either of these cases the result would have been the same as that produced by the contract actually made. How then does the bank gain or he lose by the mode adopted in the contract actually made? Not the least that we can perceive; the result appears to be precisely the same.

This being the fact, with what propriety can this be called a *dealing in cotton*, within the meaning of the prohibition of the charter? What avocation or pursuit of the citizen does it interfere with? In what manner does it bring the capital of the Bank in conflict with the pursuits of individual enterprize? The contract of the Bank is not, that we can perceive, obnoxious to any of these objections; and to prevent these, was the sole purpose of the interdict in the charter.

It may be said that it would tend to diminish the profits of the commission merchant in Mobile, by abridging his business, but if we were to concede that such a remote consequence as this would make the contract void, the consequence itself would not follow; for if the owner of cotton did not wish to ship it to a foreign port, he would not want the aid of the Bank; therefore, the arrangement offered by the bank could not affect the Mobile commission merchant.

With no propriety of language can the transaction set out in the plea be considered a *dealing* in cotton; whether the term be considered in its popular sense, or in reference to any consequence which could flow from it as an interference with the ordinary business of the country. It is true, that the Bank acquired by the contract a right to control the sale and receive the proceeds of an article of merchandize, and it has sometimes been said that *names* are *things;* but courts of justice look at the substance of things and endeavor to ascertain the true intent and meaning of parties. There is no canon of legal criticism which authorises the court to sacrifice the plain intent and meaning of the parties to the letter of the contract, especially in a case where the question is whether there has not been a forfeiture of a charter, and that too in a case where the actors are the mere agents of the public.

When this contract was made, the public were clamorous for accommodations at the Bank—the directors were willing to give the accustomed facilities to trade and commerce, and to relieve the agricultural class, if it could be done with safety to the Bank; to accomplish these purposes, this plan was devised.

It was also strenuously urged that the fact that the Bank took bills of exchange which were not to fall due until a period within which the cotton would be sold, and agreed still further to prolong the time of payment for any deficit which the cotton might not yield, shows that the loan was made on the cotton, and that the bill of exchange taken at the time, was a mere incident.

There can be no doubt that one object the Bank had in view was to procure specie, and for that purpose, as well as to secure the payment of the loan, insisted on. such an arrangement as would secure at the same time the payment of the debt, and supply it with specie. But as this motive was not only a legal, but a laudable one, we cannot perceive how the admission that such was the fact, can affect the question. It seems also to have been expected that the bills would be paid, or nearly so, by the sale of the cotton, and therefore no reason existed for demanding payment sooner; and that expectation explains the promise made by the Bank to wait with the parties for the residue, if disappointed in the sale of the cotton.

Every corporation, unless expressly forbidden, has by implication of law, the power to do such acts as are essential to its existence, or necessary and proper to enable it to perform its functions, and fulfil the object of its creation; and this consideration alone will go far to show that this contract was lawful, because it was a mode of replenishing the vaults of the Banks with specie. This was a duty which it was under the highest obligation to the people of this State to perform; not only because the principal object of its creation was to furnish a sound currency, but because there was an express legislative injunction to increase the amount of specie in its vaults How was this to be accomplished? Specie no longer flowed as a circulating medium in the usual channels of commerce, but had become an article of *merchandize*. To go into the market and

purchase it with its own notes depreciated as they were, would have been ruinous to the Bank—to exact it from its debtors would have been ruinous and unjust to them, had it been practicable. As the Bank was forbidden to purchase, for sale, the great staple of the country, and the purchase of foreign bills was hazardous, it would seem the Bank embraced the only alternative left, to replenish its vaults with the precious metals, and at the same time accommodate our own citizens. We do not mean to say, however, that it was the only alternative; it is sufficient, that it was a means to accomplish one of the principal objects of its creation, and not *forbidden* by the charter.

Still less are we to be understood that no errors were committed in the execution of the plan;—there was at least one, which it is strange was not foreseen. It might have been foretold, without the gift of prophecy, that when the Bank permitted the borrower to receive on his cotton an amount which could only be returned by a sale of the cotton in the event of a great increase in price in the foreign market, they were sowing the seeds of future law suits. This was an error, however, which though the Bank may lament, the borrower ought not to complain of. Loans should also have been confined to the actual owners of cotton, and speculation, as far as possible, precluded. These evils, however, grew out of an abuse of the plan, and did not necessarily flow from it, or at all events were not contemplated.

The 12th section of the "Rules and Regulations," which proposed to make loans of money on a *future* pledge of cotton, secured in the mean time by bills of exchange, to those who were greatly pressed for money, and who had not the ability *then* to deliver the cotton, is quite conclusive to show that, at least in that class of cases, the loan was made on the security afforded by the bills of exchange, and is quite persuasive of the opinion of the Board of Directors, of the character of the contracts they were proposing to enter into, and their motive for engaging in it.

Our opinion, however, has been formed from the contract, as set out in the plea. Detached parts of it, and single expres-

35

sions may, doubtless, be selected, which considered alone, and independent of the manifest intention of the parties, the scope and design of the contract would justify the conclusion that the money was advanced on the cotton, and that the bills were merely taken as collateral security; but considered as a whole, we have not the slightest doubt that it was such a contract as the Bank might lawfully make under its charter—that it was a loan of money, secured by bills of exchange, for the re-payment of which, and as one of the conditions of the loan, authority was given to the Bank to direct the sale of a specified amount of cotton, and appropriate the proceeds to the payment of the bills. That the Bank has no power to make such a contract as this, to enable it to perform its functions, has not been, and we think cannot be, shewn.

It was also insisted, by the counsel for the plaintiffs in error, that the reservation of one per cent. by the Bank, above the expenses, shows that this was the common case of goods received, to be sold on commission. We are satisfied that the Bank cannot, under this contract, retain any amount beyond the actual expense attending the shipment and sale of the cotton, insurance, &c. This reservation was doubtless made from the habit of Banks to charge a commission on cashing checks of other Banks, and probably, to cover such incidental expenses as postage, &c. which could not well be ascertained at the time of the settlement of the accounts. Be this as it may, the reservation of this small amount as a commission for the transaction, cannot be held to give such a character to the contract as to change its entire object and purpose, which was obviously not to obtain cotton to sell on commission, but as already stated, was entirely different in its character, purpose, and design, and so understood by all parties. Nor does it appear, or is it alleged, that the Bank claims the right to retain this sum so reserved. The case of *The New-York Fire Insurance Co.* vs. *Sturges—2 Cowen,* 675—is, in one aspect, very similar to this point of this case, and indeed, much stronger.

We have been admonished, by the counsel for the plaintiffs in error, that, notwithstanding the State is the party interested,

as defendant, on this record, the true interest of the people will be promoted by declaring the contract void.

It required no admonition to impress us with the conviction that the high trust reposed in us by the people, imperiously demanded of us to preserve pure the fountains of justice.    Nor will we profess an insensibility which we do not feel, to the approbation of the enlightened and the virtuous; although all experience shows that such is not always the meed of upright conduct.    Our station imposes on us the necessity of deciding the cases brought before us, according to our opinion of the law : it is a duty which we cannot avoid.    If left to our own choice, it is not probable we would have selected this question for adjudication; and as, in our judgment, the law is for the State, such must be our decision, be the consequences to us what they may, and although the judgment may subject us to the imputation of the bias which the argument of counsel supposes.

Something was said in the argument of the morality of this defence.    On the one hand, the defendants were considered as public benefactors, resisting an unlawful claim, and on the other, as setting up an unjust defence.

How far the defendants may be bound in honor or conscience, to refund money received by them on a contract which they have voluntarily entered into, and of which they have had the benefit, is a question which they have a right to settle for themselves : such considerations can exert no influence in this Court.

It remains but to add, that there is no error in the judgment of the Court below, and it is therefore affirmed.

COLLIER, C. J.—If this were a case of ordinary interest, I should content myself by declaring my acquiescence in the judgment of affirmance, but the vast amount depending upon our decision, and the zeal which has been manifested in the argument, admonish me that it is proper to express the views which have convinced my judgment, of the perfect correctness of the conclusion of a majority of the Court.

The concluding averments of the plea, if not deductions from the facts stated, must be considered as a substantive ground of

defence; and in that view the plea is demurrable; because it embodies the matter for several pleas. And so much of the plea as avers that the bill was delivered and received for the purpose merely, of securing such part of the sum borrowed, as might not be reimbursed by a sale of the cotton, is bad; because (as will be hereafter shewn,) such an averment is a denial of the *legal effect* of the written transaction, and if issue were taken on it, would tolerate the admission of parol evidence for that purpose.

In respect to the agency of Cook, it is not denied; and it can not be doubted, at this day, but a corporation may appoint an agent to transact business within the scope of its powers. It is admitted that Cook acted under an authority from the Bank, and his acts have been recognised by the Bank, as the record sufficiently shews.

It cannot be seriously insisted that the *proviso* to the 4th section of the Bank charter is *imperative,* in declaring " That no individual shall at any time be indebted to the Bank as indorser on any draft or bill of exchange, for a larger amount than five thousand dollars." In addition to what has been said by my brother ORMOND on this point, I have only to remark, that reports have been repeatedly made to the Legislature, showing that members of the two Houses, and some of the Directors have been indebted, largely more than five thousand dollars to the Bank. Instead of resolving that such excessive accommodations were unauthorized, the act of the 23d December, 1837, " To limit the accommodations of the President and Directors of the Bank of the State of Alabama and its several Branches," by direct implication, admits that they were not illegal. It is by that statute enacted, that it shall not be lawful for any President or Director thereafter to be indebted to the State Bank or its Branches in a larger sum than ten thousand dollars, with the exception of the President and Directors of the Branch Bank at Mobile, who are limited in their indebtedness to the Bank and its Branches, to the sum of twenty thousand dollars.

But the main question to be considered is this, is the contract alleged in the plea, such as the Bank was authorised by its charter to make? The solution of this question makes it necessary to examine into the character of the regulations adopted by the

Bank on the 29th August, 1838 ; and to inquire whether, in their adoption, the Directory transcended their powers.

1. The first branch of the inquiry may be most intelligibly answered, by laying down the rules for the construction of contracts so far as applicable to the present case. It frequently happens that a part of a writing contradicts some other portion of it, so that the whole cannot operate together, if literally interpreted, or a literal interpretation may defeat the object of the parties. When this is the case, if the subject matter of the contract be legal, resort must be had to construction.

In expounding agreements, the construction must conform as nearly as the rules of law will admit, to the apparent intention of the parties. Where a writing or some clause is capable of two significations, it should be understood in that sense which will have some operation, rather than that which will have none. If therefore the words used be susceptible of two senses, the one agreeable to, the other against the law, the former sense shall be adopted. *Ut res magis valeat quam pereat.* The subject matter of a contract, and the inducements which lead it, must be looked to in determining the meaning of contradictory or obscure parts of it.

Again : in the construction of all instruments, the Court must not allow to a particular expression a controlling force, but the intention must be gathered from the whole writing ; unless it be manifest that its author intended otherwise. And the different clauses in the same instrument, must be construed in reference to each other, whether they precede or follow.

An agreement is to be understood according to its sense or meaning, as collected from the terms used in it, which terms are themselves to be understood in their plain, ordinary and popular sense, unless they have generally, in respect to the subject matter, as by the known usage of trade, &c. acquired a particular sense, distinct from the popular sense ; or unless the context evidently points out that they must, in the particular instance, and in order to effect the immediate intention of the parties, be understood in some special sense.

In expounding a contract, extraneous matter explanatory of it, may be resorted to—form is regarded as unimportant, if its es-

sence and meaning can be ascertained, consistently with its terms. These rules all rest upon the highest authority.— *Chitty on Con.* ed. 1839, 62 *to* 75, *and cases cited—Pothier, p.* 1, c. 1, § 1, *art.* 7—*Harper* vs. *Hampton,* 1 *H. & Johns. Rep.* 672—*Fallow* vs *Martin,* 1 *Harper's Rep.* 410—*Falcon, adm'r* vs. *Harris,* 2 *H. & M. Rep.* 550—*Archibald* vs. *Thomas,* 3 *Cow. Rep.* 284— *Wells* vs. *Hunter,* 17 *Martin's Rep.* 121—*See also* 2 *Cow. Rep.* 195—8 *Mass. Rep.* 214—10 *Mass. Rep.* 379—11 *Mass. Rep.* 302—11 *Pick. Rep.* 154—4 *Dall. Rep.* 345.

Dr. Leiber, an author of profound erudition in his work upon "*Legal and Political Hermeneutics*" says, "Faithful interpretation implies, that words or assemblages of words be taken in that sense in which we honestly believe that their utterer attached to them;" page 99. The probable sense of words must prevail, unless the text indicates, that they were used in their original etymological sense.—*ibid.*

Words of a general meaning must be taken in an expansive sense, if the text shows that they were thus used, but not if they have been used to express something definite or absolute—*ibid.* 137—144.

The same words even in the same text have not always a sameness of meaning—in one place it may be general—in another restricted—in one a technical—in another a popular meaning—*ibid.* 167.

The general and superior object cannot be defeated by a less general and inferior direction. If therefore we may attach two or more different meanings to a sentence, that is the true one which agrees most with the general and declared object of the text—*ibid.* 112.

Having stated these principles as our guides, we proceed to the examination of the contract alleged in the plea of the plaintiffs in error. The rules and regulations of the Bank recite as a preamble, that "The board of Directors being desirous of placing the Bank, in a situation to resume specie payment as early as possible, and to maintain the character and value of its paper, and in order to accomplish these two important and desirable objects, she must be provided with a suitable propor-

tion of specie and exchange funds; will make advances on cotton under the following "rules and regulations," &c.

In addition to our own knowledge (as a matter of current history,) of the condition of our banks, we are informed by an act of the Legislature of the 30th June, 1837, that they had a short time previously suspended specie payments. That act approved the suspension, but required the bank, at different periods up to the first of July 1841, to procure and deposit in their vaults, amounts of specie bearing a prescribed proportion to their capital stock, with a view to the resumption and continuance of specie payments.

The object of the bank was doubtless well intended—among other things to enable it to comply with the requisitions of the act. It is not intimated that it proposed to engage in the purchase of cotton, but only, that it was willing to obtain the control of that article, if the regulations adopted were complied with.

Stress has been laid in argument upon the term "advance," as being itself sufficiently potent to show, that the bank parted with its money upon the faith of the cotton alone; and that the bill was merely received as a security, for any sum which the cotton might fall short of reimbursing. Such an argument is clearly indefensible. A single word or clause, no matter where its position, or how strong and direct in itself, cannot be allowed to give a meaning to the instrument, obviously against the intention of the directory, and utterly subversive of the object contemplated. The verb "advance," as applied to commerce means, "To supply before-hand, to furnish on credit, or before goods are delivered, or work done; or to furnish a part of the stock, or fund; as to *advance* money on loan or contract, or towards a purchase or establishment." As used in the regulations of the bank, it means a loan of money to a party, who as a means of guarantying its repayment, either delivers or undertakes to deliver to the agent of the bank, a quantity of cotton, worth at the time of the loan within 25 per cent. at least, of the amount of the sum borrowed. But although this loan be made upon cotton delivered, or agreed to be delivered, yet the regulations when looked to, as an entire instrument, most expli-

citly show that before any contract in regard to the cotton could be consummated, the bank must have assented to the purchase of a bill, for the payment of which the cotton is to be placed under its direction. No stipulation for the cotton was to be made until a bill, such as the charter requires, viz: "with two or more good names thereon" shall have been purchased by the bank. True the purchase of a bill and the receipt of the cotton may have been simultaneous, yet in the order of things the former must have preceded the latter; for until the bill was purchased, the bank would not advance its money, and could consequently acquire no right to control the sale of cotton.

The regulations pointing out who should be the consignees of cotton at different places, &c. were doubtless dictated by a cautious regard to the supposed interest of the bank. As the bank adopted such a measure, for the purpose of procuring specie and exchange funds, it was indispensable to a compliance with the provisions of the act of June 1837, that its funds when realized should be in hands which would honestly hold them subject to its order. It was further proper, that the agents of the bank should be known to persons applying to borrow money, that they might determine whether they were willing to intrust the sale of their property to their prudence and discretion. Such a precaution was very natural. Confidence in the integrity or solvency of those engaged in commerce, had to a great extent become impaired. Instances of failure and a want of moral principle, were not unfrequent among those who had ranked high in public estimation.

The directory manifested an indisposition to lend money, when the cotton was not to be delivered immediately. In such case it was necessary to satisfy them, that the applicant for a loan was solvent—the paper offered was good—and that he was in danger of having his property sacrificed, in consequence of his inability to pay some demand against him. In addition to all which, he was required to give his written pledge, that he would deliver the receipt of a warehouse man or his agent by a prescribed day, for a sufficient quantity of cotton to cover his bill. Here then we learn that it was not the sole object of

the bank to obtain "specie and exchange funds," but to relieve to some extent the pecuniary pressure existing in the community. The performance of this latter office, however, was made subservient to the former duty.

As the object of the Bank is sufficiently indicated by the regulations, the reservation to itself of *one per cent.* on the sales of cotton, cannot defeat the contract by which it acquired the bill; even conceding that it may have afforded to the plaintiffs in error, a legal ground before the cotton was sold, to reclaim it, and prevent an appropriation of the proceeds to the payment of the debt. But the object in making this regulation, we think, was not to make a profit to the bank, but merely to indemnify it for any incidental charges it might incur in supervising the business, and obtaining the possession of the funds arising from the sale. Be this as it may, the Bank cannot insist upon a right to retain more than the actual expences of directing the business, &c.

Taking the regulations as a whole and applying to them the principles we have laid down, we think the transaction between the plaintiffs and defendant may be thus stated. Bates being desirous of borrowing money from the Bank, applies to its agent in Mobile—makes bills with two indorsers who are reputed good, and proposes as a further security to place under the control of the bank a large quantity of cotton. The agent receives the securities offered, and pays him the money. What is this *in point of fact*, but the lending of money upon the credit of the bill, with the cotton as collateral security? The bill is actually *purchased*, and the bank becomes its *proprietor*, while the cotton is received as a *security only*, for the repayment of the money advanced. Words and forms we have seen are nothing, if the intention of the parties can be ascertained from a view of the entire transaction, the contract must conform to it.

That the parties intended to contract in reference to the law cannot be doubted. No advance of money was to be made, unless a bill with two good indorsers was given, no matter what quantity of cotton was delivered. And it is our duty as alrea-

dy shown, so to construe their contract, if practicable, that it may have the effect which the parties designed, instead of being inoperative and in derogation of the charter of the Bank. To attain this conclusion we need but look at the regulations themselves—their object—the state of things existing in the country at the time of their adoption, &c.   In determining the meaning of a contract, the situation and true intent of all parties as well as the subject matter we have seen, are to be considered.   And it has been held, that where there are several writings made at the same time between the same parties, and relating to the same subject, they constitute but one agreement, and the court will presume such a priority in the execution, as will best effect the intent of the parties.   Newell vs. Wright, Mass. Rep. 138—Summers' adm'r vs. Williams, et al, 8 Mass. Rep. 214—The T. & S. Boston T. Cor. vs. Whiting, 10 Mass. Rep. 327—Fowle vs. Bigelow, 10 *ibid.* 379.—Hopkins vs. Young, 11 *ibid.* 302—Stephens vs. Baird, 9 Cow. 274—Makepeace vs. Harvard College, 10 Pick. Rep. 302—Sibley vs. Holden, *ibid.* 250—Hunt vs. Livermore, 5 *ibid.* 395.

So solicitous have courts been to effectuate the intention of the parties, that they have held the same words to convey different meanings, according to the context and subject-matter.   Thus in Pugh and wife vs. Duke of Leeds. Cowp. Rep. 714, a lease was made to hold "from the day of the date."   The question was, whether "from" meant inclusive or exclusive of the day. Lord Mansfield pronounced a most elaborate judgment, in which after reviewing the authorities upon the subject he concludes, that it may mean either "That the parties necessarily understood and used it in that sense which made their deed effectual. That courts of justice are to construe the words of parties, so as to effectuate their deeds and not to destroy them; more especially where the words themselves abstractedly may admit of either meaning."

So where there appeared no intention to enter into a contract in violation of law, yet if such would be the effect of the agreement, if literally interpreted, courts under the influence of the maxim *ut res magis valeat quam pereat,* have enlarged or

restricted the meaning of the words employed, that the contract may operate rather than fail. Thus in Harrington vs. Kloprogge, 2 B. & B. Rep. 778, note, which was an action upon a bond for the performance of an agreement to assign "any office of trust, commission, place, or pension whatever." The defendant odjected to the validity of the agreement; *First*, that it was illegal and void by statute, being for the purpose of assigning all offices, &c. and that to assign an office of trust was illegal. *Second*, that by the common law offices of trust could not be assigned. Lord Mansfield said, "there is nothing in the objection. The agreement is for the assignment of all offices, and is good as to all offices *which may legally be assigned.*— The profits arising from this office of private secretary to Lord Holdernesse might be assigned; and as to all others they are not within the present case."

Upon the same principle says an eminent elementary writer, "If by a particular construction, the stipulation of the party would be frivolous and utterly ineffectual, and the apparent object of the contract in reference to its subject-matter, &c. wo uld be frustrated; but a contrary exposition, though *per se* the less appropriate (looking to words only) would produce a different effect; the latter interpretation shall be applied to the agreement, if it can possibly be supported by any thing in the contract, or the nature of it. Chitty on Con. 4 American ed. 67. To the same effect is Davis' heirs vs. Taul & wife, 6 Dana's Rep. 53.

Thus we see the great anxiety manifested to sustain and expound contracts according to the understanding of the parties, where there was no intention to violate the law. A principle dictated by the most enlightened equity, and one which cannot be departed from, without impairing the morality of the law, and lessening the respect of the community for the tribunals of Justice. The regulations of the Bank, were evidently not framed with a regard to precision in the employment of words and cannot therefore receive an etymological construction; consequently it is the duty of the court to give to them such a meaning as consistently with *their nature and object*, and the popu-

lar use of the terms, they should receive. This I have endeavored to do, and must be permitted to say, that I cannot doubt, that the contract in regard to the cotton, is according to the acknowledged rules of interpretation, accessorial to the loan of money upon the bill.

Let it however be conceded, that the view which I have taken is indefensible, and that the transaction *was a direct advance of money on cotton,* and then I will show, that the plaintiffs in error do not occupy a more favorable position. If the regulations of the Bank are to be literally construed, the loan was not made upon the faith of the cotton, but upon the bill also; each of which was simultaneously delivered by the borrower to the Bank. This being the case the lender would have two securities for the payment of the money; and these, though shown by distinct writings, constitute parts of an entire contract. The plaintiffs can't place their case in a stronger point of view (consistently with the facts set out in their plea) than this. They cannot say that although the bank required a bill with two good names on it, to be given before money would be advanced on the cotton; and although such a bill was given and received, before the money was lent, yet the advance was made *exclusively* upon the faith of cotton. Such an allegation cannot be entertained. It goes directly to contradict by parol proof, the *legal effect* of a written contract, which is regarded quite as conclusive and sacred as the letter of the contract itself. Where a written contract appears on its face to be complete, you can no more add to, or contradict its legal effect, by parol stipulations, preceding or accompanying its execution, than you can alter it through the same means in any other respect. Sommervile vs. Stephenson and another, 3 Stew. Rep. 271; 3 Phil. Ev. C. & H's ed. 1469–70, and the cases there cited. Here according to a close construction of the written contract, it appears that Bates delivered to the agent of the Bank, one thousand and twenty-two bales of cotton, and fifteen bills of exchange exclusive of the one in suit, for five thousand dollars each, with two good names thereon, being such bills as its charter authorised it to purchase, and received therefor seventy-nine thousand, six hundred and thirty-two dollars and seven-

ty-five cents. The cotton was to be sold by agents named by the Bank, and the proceeds applied to the payment of the loan. The bills were protestable at maturity, if not paid, so that the liability of all the parties might be fixed. Upon the cotton being sold and its nett proceeds proving insufficient to pay the sum borrowed, Bates had the privilege of adjusting the deficiency, by a good bill having not longer than the 15th February thereafter to run. This, as I understand it, is a fair statement of the agreement between the parties, according to the *most rigid interpretation.* The bank then has a two-fold security for the money it has lent, or advanced if you please, viz: upon the bills, and the cotton. The first is such a paper as it may by the express terms of its charter advance on; the latter it can only deal in, for the purpose of securing a debt which may be due to it. The question now arises, if one of the securities be unauthorized by statute, or in other words illegal, is the other security which is legal thereby rendered invalid. Lord Hobart speaking in reference to the statute of 23 Hen. 6, ch. 9, which declares if any of the sheriffs, &c. shall take any obligation in any other form, by colour of their office, that then it shall be void, "says that the statute is like a tyrant; when he comes he makes all void. But the common law is like a nursing father, makes void only that where the fault is, and preserves the rest."

Norton vs. Simmes, Hob. Rep. 12 c. page 48—Maleverer vs. Redshaw, 1 Mod. Rep. 35. This remark of Lord Hobart has been frequently misapprehended. It has been quoted to prove that a contract void in part by statute is void *in toto,* while it establishes no such principle. It is a mere declaration, that where a statute prescribes the form of an obligation, and enacts that one taken in any other form shall be void, if the terms of the statute are departed from, no obligation is incurred by the party undertaking to bind himself. Thus far the remark is well founded in law.

In Kerrison vs. Cole, 8 East's Rep. 236; the instrument in question was a bill of sale and mortgage of a ship, which by statute was declared to be "utterly null and void, to all intents

and purposes." In the instrument was a covenant to repay the money lent. Mr Justice Lawrence remarked that the decision of Lord Hobart did not apply to different and independent covenants and conditions in the same instrument; which may be good in part and bad in part, and that the undertaking to repay the money was good as a personal covenant. And with him the whole court concurred.

In the case of Greenwood vs. The Bishop of London, 1 Marsh. Rep. 292, the court state with great clearness, the distinction between those cases, where the statute had declared the instrument taken in any other form than that prescribed by the statute to be utterly void; and those cases where it had declared the instrument void only as to the illegal act, grant or conveyance. And in *Ex d'em.* Thompson vs. Pitcher, 2 Marsh. Rep. 61, Lord Chief Justice Gibbs in considering the argument, that if the deed was void as to part, it must be void as to the whole, remarks, "if the objection had been derived from the common law, it is admitted that it would not be the consequence. But it is urged that the statute makes the whole deed void. The truth is, there is no difference between a transaction void at common law, and void by statute. If an act be prohibited, the construction to be put on a deed conveying property illegally is, that the clause which so conveys it, is void equally whether it be by statute or common law. But it may happen, that the statute goes further, and says that the whole deed shall be void to all intents and purposes: and when that is so, the Court must so pronounce, because the Legislature has so enacted; and not because the transaction prohibited is illegal. I cannot find in this act any words which make the entire deed void, &c. I think this grant of that interest in land, which by the terms of the grant is to be applied to a charitable use, is void; and that the deed, so far as it passes other lands not to a charitable use, is good." And this, say the Supreme Court of the United States, in the United States vs. Bradley, 10 Peter's Rep. 343, is the clear result of the English authorities.

In the latter case, the Court remarks, "That bonds, or other deeds may in many cases be good in part, and void for the residue, where the residue is founded in illegality, but not *malum*

*in se,* is a doctrine well founded in the common law, and has been recognised from a very early period. Thus in Pigott's case, 11 Co. Rep. 27, b. it was said that it was unanimously agreed in 14 Hen. VIII, that if some of the covenants of an indenture, or of the conditions indorsed upon a bond are against law, and some are good and lawful, that in this case the covenants or conditions which are against law are void *ab initio,* and the others stand good." *Further:* "There is no solid distinction in cases of this sort, between bonds and other deeds, containing conditions, covenants, or grants not *malum in se,* but illegal at common law; and those containing conditions, covenants, or grants illegal by the express prohibitions of statutes. In each case, the bonds or other deeds are void as to such conditions, covenants, or grants which are illegal, and are good as to all others, which are legal and unexceptionable in their purport. The only exception is, when the statute has not confined its prohibitions to the illegal conditions, covenants or grants; but has expressly or by necessary implication, avoided the whole instrument as to all intents and purposes." To this effect are Mouse vs. Leake, 8 Term Rep. 411.—Wigg vs. Shuttleworth, 13 East's Rep. 87—How vs. Synge, 15 East's Rep. 440—Newman vs. Newman, 4 M. & Selw. Rep. 66—The Post-Master General vs. Early, 12 Wheat. Rep. 136—Smith vs. United States, 5 Peters' R. 293—Farrar & Brown vs. The United States, 5 Peters' Rep. 373. Many other citations might be made to the same point, but the question may be regarded as indisputably settled.

In the case before us, the statute contains nothing more than an inhibition against dealing in " goods, wares and merchandize," without declaring to be void the entire instrument by which such dealing may be evidenced ; and if the cases cited, may be regarded as correctly ascertaing the law, the advance upon the bills is clearly distinguishable from the direct advance upon the cotton. Where two securities are given at the same time, for the payment of a debt, if there is nothing in the terms, or nature of the contract, indicating a different intention, they are regarded as primary and concurrent, and neither will be considered as subsidiary to the other. And if

the agreement of the parties is reduced to writing, parol proof going to vary its *legal effect*, is inadmissible, upon the ground, that it would establish a contract, different from that to which the parties had assented, and thus defeat their intention by a lower grade of evidence. There is certainly nothing in the nature of the contract and the character of the securities, to show that the bills were auxiliary to the cotton; but if either be secondary, as already shown, it must be the cotton.

This being the case, if the transaction was illegal as it respects the cotton, it was competent for the plaintiffs in error, thus far to have avoided it any time before the sale, and left the Bank to its remedy upon the bills. But the case presented by the record, is not an effort to defeat the security of the defendant upon the cotton. It discovers an attempt to prevent the collection of a bill, which was obtained from the plaintiffs, by the loan of a sum of money of an equal amount; because the defendant was induced to advance its money, not upon the bills alone, but the further security of the cotton also. Such a defence cannot be tolerated, without an utter disregard of many solemn adjudications, and over-riding principles of law resting upon the firm basis of reason and equity; and consequently, it can never receive my sanction. The sale of the cotton, and an appropriation of the proceeds to the payment of the bills *pro tanto*, can have no influence upon the right to recover the residue.

It was objected at the argument, that the Bank, by its contract with Bates, became his commission merchant for the sale of the cotton received. Without undertaking to deny, or admit, the truth of this assumption, it is according to the view which I have taken of the case, wholly immaterial of what character in point of law, was the control which the contract gave the Bank over the cotton. If it is regarded as a mere security for the payment of the bill, the validity of the bill cannot be affected by the invalidity of the security. So, if the money was advanced on the cotton directly, it was also advanced on the bill; and although the former be void, the latter security is not thereby impaired.

The fact that the bill was payable in Mobile, and the cotton to be sold in Liverpool, is a feature in the transaction which

cannot influence, to any extent, the decision of the cause.    If the cotton was a security for the payment of the bill, it was entirely competent for the parties to stipulate that it should be sold in Liverpool, or elsewhere, without prejudicing a recovery upon the bill.    And whether thus regarded, or as a direct security for the money, it was entirely competent for Bates, at any time before the sale, to have claimed it.    In the former case, it would have been necessary to make his claim available, to show that the bill had been paid; in the latter, as the Bank had no right to retain it, there would be no necessity for extinguishing the debt.    This brings me to consider the second branch of the inquiry, viz: Is the contract between Bates and the Bank such as the Directors were authorized to make?

2. The answer to this question must depend upon the construction of the 20th section of the Bank charter, which is in these words:

" The said Bank shall not deal in articles of goods, wares and merchandize, in any manner whatever; unless it be to secure a debt due said Bank, incurred by the regular transactions of the same, as is provided for in this act."

It may be well to premise, that the rules in regard to the construction of contracts, apply also to statutes, (Leiber's Hermenuetics, 166); that the causes which lead to the enactment of a law, may be consulted for the purpose of ascertaining its meaning where doubtful, (ibid. 167); and that the letter of a statute may be enlarged or restricted by an equitable construction, so as to carry out the intention of its framers, (Dwarris on Sta. 724 to 728.)

The preamble of the act to establish the State Bank, recites that—

" Whereas, it is deemed highly important to provide for the safe and profitable investment of such public funds, as may now, or hereafter, be in possession of the State, and to secure to the community, the benefits, as far as may be, of an extended and undepreciating currency : Be it therefore enacted," &c. .

Here is an explicit and, doubtless, a sincere declaration on the part of the Legislature, of the causes which prompted it to charter a Bank, viz: *First*, to provide for the safe and profitable investment of the public funds.    *Second*, to secure to the

36

community the benefits of a sound and extended currency. To effect these objects, which are intimately connected with each other, it was quite natural that the corporation should have been prohibited from dealing in "goods, wares and merchandize." It could not, with safety, advance its funds, upon the mere pledge of property for their re-payment; such a security being liable to waste, decay and destruction. Nor could it engage in the business of buying or selling—the fluctuating value of all property would make such an investment, more or less, hazardous; besides, if it did not affect the soundness of its currency, it would necessarily limit the extent of its circulation, and thus defeat one of the cardinal objects, which the Legislature proposed to effect.

The idea that this restriction upon the power of the Bank, (as insisted at the argument,) was to prevent it from becoming a competitor in the purchase of the staples of the country, is to me entirely novel. I heard the debate in the Senate upon the Bank bill in December, 1823. The measure, I think, owes its origin to an individual who has since filled the highest office in the State, and is still respected for his virtue, intelligence and gentlemanly bearing. The debate was mainly conducted by the author of the bill on the one side, and the learned counsel (who, but for sudden indisposition, would have argued this cause for the plaintiffs) on the other. During that discussion, not a word was said as to the necessity or propriety of taking from the Bank a capacity to enhance prices, by prohibiting it from directly going into the market as a speculator, or giving to its funds such a direction, as would aid the views of others in their speculations. If it had have been supposed, that an institution, with so small a capital as that with which our State Bank commenced business, could, by the emission of its paper, have advanced very sensibly the staple of the country; I am quite sure that it would have encountered much less of opposition.

If a solicitude, in 1823, to prevent the Bank from enhancing the products and other property of the country, induced the insertion of the 20th section, it is wonderful to contemplate the change the public mind underwent in 1832, when the first Branch was established, and during the intervening period, up

to 1835, when the last Bank charter was enacted.    Even up to the latter period, when the country had become pressed down by debt, incurred in consequence of the facility with which money was obtained upon loan, the demand was loud for an increase of the banking capital.    It was said, that such was the disproportion between the issues of the Banks and the staple of the country, that the planter could not sell his cotton at home for a price which the foreign market justified.    The fashionable expression was, "our banking capital should be increased, that the resources of the State may be developed!" I mention these things merely to show, that the legislation of this State in regard to Banks, has never been directed with a view to depress prices, or to check the most active speculation in the products of the soil.

The object of the 20th section, according to the established rules of construction, must have been such as I have indicated; or else it must have been inserted as a matter of course; because a similar provision was found in other Bank charters.

The section is certainly beneficial in its tendency, and should be so construed as to give effect to the intention of the Legislature.    The view which I take of this case, does not require me to show, that the prohibition should receive any other than the most extensive construction.    I only insist, that it is not necessary that the debt, to be secured by dealing in "goods, wares and merchandize," as the exception authorizes, should be past due.    If it be a regular transaction by which the debt to the Bank is incurred, though the day of payment has not arrived, the case comes within the exception.    No particular stress can be laid upon the term "due."    It was only intended to complete the sentence, and express the idea of indebtedness, whether to be discharged presently, or at a future period. "Payable to," or "owing to," would have expressed the meaning intended; but "due," when considered in reference to the subject matter, is quite as appropriate.

The case of a sum of money already agreed to be paid to the Bank, does not come within the mischief it was intended to prohibit; but a debt running to maturity, comes within the spirit of the exception to the prohibition.    It was intended to place a restriction upon the Bank, to prevent it from so dealing

as to defeat the object of its creation; and, at the same time, to confer on it such authority, as would enable it to secure its debts. It may, and has sometimes, happened, that the Bank is over-reached, and discounts paper that is not secured by responsible sureties or endorsers. In such case, it is important to its interest, that it be authorized to obtain collateral security as soon as the character of the parties to the paper is discovered. It is then obvious, from the reason of the thing, that the Legislature did not intend to restrict the exception to paper already *due*, but to extend it to all liabilities regularly incurred to the Bank.

But taking it as true, that the section we are examining, was inserted as a check to secure " the safe and profitable investment of the public funds," and " the benefits of a sound and extended currency ;" and its object and purpose cannot be defeated, because, in loaning its money, the Bank received as security for its repayment, "goods, wares and merchandize," in addition to such paper as it is authorized by its charter to discount. Such a transaction, instead of thwarting the intention of the Legislature, is calculated to advance it; as the security upon property would more certainly insure payment, than a mere personal liability upon a note or bill. This being the necessary conclusion, it follows, according to the principles of construction, that the prohibition of the 40th section, will not avail the plaintiffs in error as a bar to a recovery.

It is argued for the plaintiffs, that as the Governor and House of Representatives disapproved of the regulations of the Bank, their opinion should be regarded as strong persuasive evidence, that in the transaction between Bates and the defendant, the latter exceeded its powers. The Journal of the House of December and January, 1838–9, which has been cited to prove the fact, which the argument asserts, by no means satisfies me, that transactions of the character of the one in question, were intended to be denounced as illegal; but I am disposed to think that it was merely proposed to declare, as unauthorized, the dealing in cotton generally. Be this as it may; I am quite sure, that neither the Governor nor the House ever supposed, that the entire transaction was so utterly void, as to prevent a recovery being had on the bill that was given

and purchased by the Bank simultaneously with the delivery of the cotton. If this argument were entitled to any weight, which I, by no means, admit, the *second* section of the act of December, 1837, "to limit the accommodations of the President and Directors of the Bank of the State of Alabama and its several branches," furnishes an ample set-off. That section, after limiting the indebtedness of the President and Directors of the Branch Bank at Mobile, concludes with the following *proviso:* "That nothing in the foregoing sections shall be construed to prohibit the said Bank (State) and branches, from purchasing of any President or Director thereof, a bill or bills of exchange, within the limits heretofore prescribed by law, drawn on cotton insured, and actually shipped to Europe, or to Mobile, New Orleans, or any of the eastern cities of the United States, for an amount not exceeding two-thirds of the estimated value of any such shipment, and secured by a transfer to the Bank or Branch, or its agent of the policy of insurance and the bill of lading, together with such personal security as the proper board of directors shall deem ample."

This *proviso* cannot be regarded as the grant of a new and substantive power to the Bank, but was doubtless introduced, as it professes, to prevent the conclusion, that the Legislature intended, by any thing contained in the act, to divest them of the right to purchase bills of the Presidents or Directors of the Bank and its Branches, predicated on the shipment of cotton. Here is an implied recognition of the right to discount such paper for all persons. As the statute relates (as its title imports) to the Presidents and Directors of the Banks, it cannot be extended by construction to embrace persons who have no connection with them; and, consequently, there could be no necessity for excepting, by the *proviso*, those on whom the statute does not operate. The proviso, then, serves as a legislative opinion, that it was competent for the Banks to deal in such paper, whenever they thought proper, except so far as it restrained them.

True, in the case supposed by the Legislature, the Bank was not to obtain the actual possession of the cotton, through the medium of its agent, before it purchased the bill; yet it was to obtain the bill of lading and policy of insurance, that it might

control the proceeds in the hands of the consignee. Again: where the purchase of such a bill was made of a President or Director, the sum advanced was not to exceed two-thirds of the estimated value of the shipment. As it respects all other persons, the act being silent, and the right of the Bank to deal in such bills impliedly recognized, it will follow that, as to bills offered by them, there is no restriction.

Between the case provided for by the statute and those contemplated by the regulations of the Bank, there is no difference in principle. It is as much a dealing in cotton to advance money upon the transfer of the bill of lading and policy of insurance, as it is upon the delivery of the cotton itself. So, if the Bank be authorized to purchase bills secured by cotton, they may, unless inhibited, purchase bills with *two good endorsers,* and, in addition, receive as security, cotton worth within " *twenty-five per cent,*" of the sum borrowed.

I should not have troubled myself to consider this argument of the plaintiffs' counsel, were it not for the purpose of disabusing the minds of some, who really believe, that the Legislature have declared its opinion, that all contracts, such as that between the parties before the Court, are unauthorized and void. Without adding any thing further on the point, it is enough to say, that so far as Legislative authority can avail, it is decidedly adverse to the defence set up.

I have already said more than I anticipated; but the great interest felt in the decision of this cause, has induced me to present very fully, the grounds on which my opinion rests. That these reasons will satisfy every person of the correctness of the conclusion of the Court, is what I cannot hope ; but that they will free me from the imputation of being indisposed to uphold the principles of law with becoming sternness, is what I do not doubt. In common with the benevolent, I lament the extensive indebtedness which is pressing upon the country; but as a Judge, I cannot if I would, and would not if I could, so modify the law as to absolve parties from the obligation of contracts. I am contented to move *super antiquas vias,* and declare the law as it is settled Under the influence of this feeling, I concur in the judgment of affirmance.

GOLDTHWAITE, J. *dissenting.*—In the present case, my judgment leads me to a conclusion essentially different from that of my colleagues. I may remark, before entering upon the examination of the question, in the solution of which we differ, that on all the other points, I yield my entire concurrence with the opinion expressed by the other members of the Court. Indeed, as to the point on which I dissent, I almost doubt whether my mind has been capable to comprehend the true bearings of this case; as it leads me to a conclusion, so opposite to that of those, for whose judgments I entertain the utmost respect.

The supposed inhibition of this transaction is, by the charter of the bank, expressed in these terms: "The said bank shall not deal in articles of goods, wares or merchandize, in any manner whatever, unless it be to secure a debt due said bank, incurred by the regular transactions of the same, as is provided for in this act."

It is said, this clause cannot receive a literal construction, because that would prohibit the bank from purchasing those articles; essentially necessary to enable it to perform its appropriate functions; but I accord no weight whatever, to such an argument, inasmuch as it would be manifestly absurd, to call the purchaser of paper, buying solely for his own use, a dealer in stationery; as it likewise would be to insist, that providing wood for the comfort of a household, made the buyer a dealer in lumber. It seems to me, it would be difficult, if not to say impossible, to make use of language more clear, definite and expressive than that which is contained in this section. It cannot be denied, that the words, buy and sell, are, at least, as common, and their meaning as generally understood, as the word deal; nor can it be said that these terms are equivalent and convertible; buying or selling, or both combined, may constitute a dealing; but to deal is not, necessarily, either a buying or selling. If the intention of this clause had been to restrict the bank, only to the extent of buying and selling merchandize, I cannot but believe these words would have been used. Instead of using these terms, the prohibition is, that the bank shall not *deal* in articles of goods, wares or merchandize. The author of the section, aware that the word deal, although the most compre-

hensive single word in our language, which could be applied to the subject matter, was, notwithstanding, capable of more significations than one, gives it the most unlimited extent by immediately adding, *in any manner whatever;* then, as if satisfied that the interest of the institution demanded, and that the public could not be prejudiced by an exception, he proceeds to annex the qualification, *unless it be to secure a debt due to said bank;* and still more certainly to make the exception with certainty, he specifies that it must, however, *be incurred by the regular transactions of the same;* then, as if it were for the purpose of setting construction at defiance, he closes the section with, ' *as is provided in this act.'*

The effect of the construction given by a majority of the Court is, as it seems to me, to make this GENERAL PROHIBITION, of dealing in merchandize *in any manner whatever*, a RESTRICTION to the extent only of dealing in merchandize *by buying and selling it for the purpose of gain;* or to the receiving of goods *to be sold for the owner, for a profit or a commission.* If no restriction beyond this was contemplated, I think very inapt terms have been used, to express the intention, and much difficulty of construction would have been avoided, by calling things by their proper and usual names.

The evils, to any community, are precisely the same, in my judgment, whether the bank enters the market openly, as a purchaser of the staple of the country, or whether it comes in the capacity of an advancing agent. In either case, individuals must give place to the corporation, and, the more especially in such a case as this, where the terms of advancing were so liberal. If the bank possesses the authority to advance on cotton, it cannot be denied as to articles of prime necessity; and thus, by enabling speculators to engross a large portion, prices might be forced up to a most speculative and injurious extent. But a contemplation of the evils of such practices is more appropriate to the legislature, than to the judiciary ; therefore, and not because the subject is exhausted, I forbear further comment on it. If, however, I was to concede that the prohibition extended only so far as to inhibit the bank from buying for gain, or selling for the owner upon commission; it seems to me, that this transaction is nothing less than the selling of the cotton for the

owner, and upon a stipulated commission to be paid by him. There is not a single stipulation in these articles, published by the bank, and which formed the basis of this contract, that is not of daily practice with commission houses in most of our cities. A commission merchant usually advances money, when required, on goods consigned to him for sale. He is responsible to his principal, for his own acts of omission, and improper conduct; and also for those of his agents, if he employs such. He is accountable for no losses, but such as arise from his own misconduct or mismanagement, or for the same acts in his agents, if he confides the property of his principal to them. And finally, he is entitled to receive the compensation he stipulates for; or, if no stipulation is made, to such as may be reasonable. The custom also is to allow interest from the period the proceeds come into his hands, and also the current rate of exchange. So likewise he is entitled to be refunded any excess of his advances over the nett proceeds of the property sold by him, or his agents. In every one of these particulars, the bank, by its contract, assumes the precise responsibilities of the commission merchant. Those intrusted to sell the cotton in the foreign port, are not the factors of Bates, but agents appointed by the Bank, and for whose conduct the bank expressly stipulates to be held responsible. It is a sale, in my opinion, to all intents and purposes by the bank itself, acting through its agents. I do not perceive how or why, if this contract is a legal one, that the bank is not entitled to the compensation for which it has stipulated.

There is another view of this case which also seems to me to be decisive that it is a dealing in merchandize. If the cotton had remained unsold at the maturity of the bills, and they had been paid by Bates in Mobile; would he have been warranted in withdrawing the cotton from the custody of the bank, or its agents, after tendering expenses? If the contract was a legal one, he would not, because it was one of the stipulations upon which the loan was made, *that the bank should be at liberty to sell it.* The contract with respect to the cotton, then, remaining in force after the repayment of the loan, by what name is it to be called? Again, suppose in this condition of affairs, it is destroyed by fire, and loss ensues, in consequence

of the neglect of the agents of the bank to insure: is there any thing in the charter of this bank to make it liable to Bates?

Yet once more; if there was a valid, subsisting right, existing in the bank to sell the cotton after the payment of the bills, and against the consent of Bates, what is there in the charter, to prevent the bank from contracting with Bates, either gratuitously, or for a commission, *and without any loan of money*, to sell his cotton in Liverpool, and become responsible for the acts of agents, with respect to it? I confess I am unable to distinguish either of these cases, in a legal point of view, from the other, and neither of them from the case at bar.

In common with the other members of this Court, I entertain not the least doubt, but that the directors of the bank, who sanctioned this transaction, were influenced by a most earnest desire, to advance the true interests of the institution, and the State at large; but the purity of intention cannot legalize an act which the charter expressly prohibits.

For these reasons, it is my opinion, that this transaction was a dealing in goods, wares and merchandize, against the positive prohibition of the 20th section of the charter of the bank; and, therefore, that the contract, and all securities, founded on it, are entirely void. The consequence, so far as this case is concerned, if my opinion was to prevail, would be, that judgment on the demurrer ought to be entered for the defendants. But, if it is asked whether this leads to the conclusion, that the State, as the sole owner of the funds of the bank, must lose the deficiency between the sum advanced, and the proceeds of the cotton, (if there is such a deficiency,) I answer, no. It is true that a nullity of the contract grows out of its illegality,—for such, I understand to be the unquestionable law of all cases; but Bates cannot insist that the contract is void, and thus entitle himself to the money advanced to him. The illegal act of the directors of the bank, could invest him with no right to the money; and, as the State is the sole stockholder or owner of the bank, it is probable, an action would lie against him to recover it. It is not the question before the Court; and therefore, it is only as to the consequences which flow from a decision, that it would be proper to inquire, whether a suit might be sustained in the name of the State, or of the bank. In my opinion, without the aid of con-

testation or argument to test its correctness; I should be inclined to think, that either might sustain the action.

There would, probably, also exist another remedy. The bank is solely owned by the State, and its directors have no interest whatever in the capital stock; from this it results, that they are mere agents, acting under the special authority, which is contained in the provisions of the charter. So long as they confine their action, with regard to the funds of the bank, and its proper business, a discretion is confided to them; but there are certain directions and prohibitions, to which, as agents, they are bound to conform their action; and, if they overstep the boundaries of their powers, and illegally dispose of the funds committed to their care, they are doubtless liable for any losses which occur, in consequence of their violation of the charter. (Taylor v. Miami Exporting Co. et al. 5 Ohio Rep. 162.)